**BURLINGTON NORTHERN RAILROAD CO., Plaintiff,**

v.

**Gerald D. BAIR, Director of Department of Revenue of Iowa, Defendant.**

**Civ. No. 83-100-A.**

United States District Court, S.D. Iowa, C.D.

July 16, 1986.

James W. McBride (Laughlin, Halle, Clark, Gibson & McBride), Washington, D.C., Stephen D. Goodwin (Laughlin, Halle, Clark, Gibson & McBride), Memphis, Tenn., Richard Malm (Dickinson, Throckmorton, Parker, Mannheimer & Raife), Des Moines, Iowa, for plaintiff.

Tax Policy of Iowa Dept. of Revenue, Mark Schuling, Asst. Atty. Gen., Des Moines, Iowa, R. Douglas Lackey, Atlanta, Ga., for defendant.

Lee Gaudineer, Des Moines, Iowa, for intervenors.

## ORDER

STUART, Senior District Judge.

The above-entitled matter is before this Court upon remand from the Eighth Circuit Court of Appeals.

Plaintiff filed this action March 2, 1983, contending that the property tax system of the State of Iowa discriminated against it three ways in violation of section 306 of the Railroad Revitalization and Regulatory Reform Act of 1976, Pub.L. No. 94–210, 90 Stat., 31, 54 (codified at 49 U.S.C. § 11503). This Court found in favor of plaintiff on one issue holding that fifty percent of the plaintiff's property was personal and should be taxed in the same manner as all other personal property in Iowa. 584 F.Supp. 1229 (S.D. Iowa 1984). The claim that in certain years Iowa assessed all of Burlington Northern's property well in excess of its true market value was dismissed. On March 15, 1985, the Court, in an unreported ruling and order, by applying the arbitrary and capricious standard, held in favor of the defendant on plaintiff's claim that Iowa assessed most other commercial and industrial property at a much lower percentage than Burlington Northern's property.

In *Burlington Northern Railroad Company v. Bair,* 766 F.2d 1222, 1226 (8th Cir.1985) the Court of Appeals held that this Court erred:

(1) in aggregating Burlington Northern's real and personal property in its section 306 (1)(a) analysis; (2) by imposing an improper burden of proof; and (3) in failing to make findings of fact on assessment values and true market values.

On remand, no additional evidence was taken, briefing has been completed and the case came on for oral arguments June 23, 1986. Before the Court is Burlington Northern's claim under section 306(1)(a), 49 U.S.C. 11503(b)(1), (c), for proper equalization asserting that the ratio of assessed value to true market value of Burlington Northern's real property exceeds the ratio of assessed value to true market value of all other commercial and industrial real property by at least five percent. This claim is based on *de facto* discrimination. Iowa law does not contain different assessment rates, but Burlington Northern claims that the tax system operates in such a manner as to discriminate against it.

Defendant's original brief on remand quoted a considerable portion of this Court's March 15, 1985, Ruling and Order and argued that the court had previously made the factual findings required by the Eighth Circuit Court of Appeals and that nothing in the circuit opinion required alteration. The Court does not agree. In reviewing the same seven errors urged here, the Court merely found that the Depart-

ment did not act arbitrarily or capriciously in using the methodology it did. The Court did make some further findings of fact. The Court will not treat them as the law of the case, but will reconsider such findings in the light of further argument and the change in the burden of proof to be used. A closer examination is called for when the Court must determine the preponderance of the evidence, rather than decide whether the conduct of the defendant was arbitrary or capricious.

In order to make the comparison for equalization purposes under section 306(1)(a), the district court must make findings of fact on: (1) the assessed value of plaintiff's property; (2) the true market value of plaintiff's property; (3) the assessed value of all other commercial and industrial property in the same assessment jurisdiction; and (4) the true market value of all such other commercial and industrial property. The district court must calculate the two ratios and determine whether they vary by at least five percent.

*Burlington Northern Railroad Company v. Bair,* 766 F.2d 1222, 1226 (8th Cir.1985).

Because of the unique nature of railroad operating property, Iowa, like most states, values it for ad valorum tax purposes as a unit. The unit concept is based on the principle that the operating property derives its true value, not from the sum of its parts, but from the integrated use of all of such property to carry traffic, generate income and render public service. As railroads are rarely sold as operating units, comparable sales are unavailable and other methods must be used to attempt to arrive at the value of the operating property of the railroad. Accepted methods are (1) the capitalized earnings method (income method); (2) the stock and debt method; and (3) the depreciated cost method.

The parties do not quarrel about the use of the unit concept nor is there disagreement over the percentage of railroad operating property allocated to Iowa. They also agree on the above methods of evaluation, but differ over the way each method should be applied in attempting to value railroad operating property.

The Court will begin its analysis by considering the most difficult and complex of the four factors upon which findings of fact must be made.

## TRUE MARKET VALUE OF PLAINTIFF'S PROPERTY

Burlington Northern contends the Department has made seven significant errors in its valuation process as follows:

A. In weighting the three accepted methods of determining market value.

B. In the income method:

1. in forecasting earnings,

2. in its treatment of current deferred federal income taxes,

3. in its treatment of current liabilities.

C. In the stock and debt method:

1. in the determination of common equity,

2. in the treatment of current liabilities,

3. in the treatment of accumulated deferred federal income taxes.

In attempting to arrive at the true market value of Burlington Northern's real property, the Court will use as a starting point, The Appraisal Report of the Operating Properties of Burlington Northern Railroad by the Iowa Department of Revenue for January 1, 1981 and January 1, 1982 (exhibits CC and DD) The Court will then discuss each of the claimed errors and arrive at the principles to govern the determination of market value of the plaintiff's operating property for the years in issue.

A. *In weighting the three accepted methods of determining market value.*

In arriving at their opinions as to the unit value of plaintiff's transportation property, the parties gave the three methods referred to above the following weight:

| Method | Plaintiff | Defendant |
|---|---|---|
| Income | 50% | 30% |
| Stock and Debt | 50% | 60% |
| Depreciated cost | 0% | 10% |

■ The depreciated cost method presumes that the value of railroad system property is equal to its original cost less recorded depreciation and estimated obsolescence. It is primarily an accounting procedure. Any relationship between depreciated cost and value would be coincidental. Mr. Nicholson, the Supervisor for Central Assessment for the State of Iowa, testified that "the cost approach in no way or in very little respects would indicate market value." The Court holds that the Department erred in giving the depreciated cost method any weight under the circumstances of this case.

The income approach attempts to arrive at the fair market value of the railroad's transportation property by capitalizing the income generated by the railroad as an operating unit. Here the parties have agreed as to the appropriate rate of capitalization but have substantial differences as to the proper stream of income to be used in the computation.

The stock and debt method utilizes the railroad's outstanding debt and the equity in all of its securities. The theory is that the true market value of the asset side of the balance sheet is arrived at by properly valuing the debt and equity side of the balance sheet. The parties have significantly different opinions as to the proper way to use the stock and debt method.

Both methods require the exercise of considerable judgment on the part of the appraisers. The Court does not believe that either is preferable. The Department erred in giving more weight to the stock and debt method than the income method. The income method is the most direct measure of the investor's or buyer's interest. Prospective buyers of stock or the system are not interested in the railroad property as such, but in the income that an investment in that property will generate.

The Court holds that the plaintiff has established by a preponderance of the evidence that in determining the unit value of plaintiff's operating property, the income method and the stock and debt method

should be weighted equally and that the cost method should not be used.

B. *In the use of the income method.*

B–1. *In forecasting earnings.*

■ In the income approach, plaintiff used the average of its computation of the operating income of Burlington Northern for the last five years on the theory that this method leveled out the extra-ordinary large items in the income stream and minimized the distortions associated with investment tax credits. The Department uses plaintiff's current year's income from operations to forecast plaintiff's income for the next year. Although the Department's use of current earnings may cause the projected income to fluctuate more from year to year, there was no showing that over the years plaintiff would be prejudiced. Very few railroad appraisers use the five year income average. The evidence has shown that the operating income of Burlington Northern has risen substantially over the last several years and its president expects the trend to continue. This evidence, coupled with the general long term inflationary trend, persuades the Court that the use of the current year's operating income to forecast the next year's income is more appropriate. Use of the five year average would result in a consistent under estimation of plaintiff's earnings for the next year, and consequently undervalue plaintiff's transportation property. If the trend should reverse and the operating income decrease, the plaintiff would have the immediate advantage of the effect of that decrease on the next years evaluation.

Plaintiff has failed to establish by a preponderance of the evidence that the defendant erred in using the current year's operating income to forecast the income to be capitalized under the income method.

B–2. *In treating deferred taxes.*

■ For book and financial reporting purposes railroads use the straight-line method of computing depreciation prescribed by the I.C.C. However, in order to

stimulate investment in new assets, federal tax laws permit taxpayers to depreciate certain asset's for tax purposes at a faster rate in the early years of an assets life and at a slower rate in the later years. Regardless of whether accelerated or straight-line depreciation is used, total depreciation cannot exceed the cost of the asset. Conceptually, the use of accelerated depreciation for federal income tax purposes simply defers payment of a portion of a taxpayer's ultimate federal income tax liability. Publically held companies, including railroads, are required to report the total tax expense attributable to pre-tax earnings, but divide the total tax between that which is currently payable under federal law and that which is deferred.

In arriving at its forecast of plaintiff's operating income, the Department allowed only the taxes currently paid as a deduction and did not consider 50 million dollars of deferred taxes as an expense. This method increases the market value of the transportation property by 250 million dollars. The plaintiff treats deferred taxes as they are treated under Generally Accepted Accounting Principles (GAAP) and ICC Regulatory Accounting and does not add the deferred tax expense back into the amount of income to be capitalized. Plaintiff's position is supported by the only three reported cases, *In re Southern Railway Co.*, 328 S.E.2d 235 (N.C.1985); *Southern Railway Co. v. State Board of Equalization*, 682 S.W.2d 196 (Tenn.1984); *Pacific Power & Light Co. v. Department of Revenue*, 596 P.2d 912 (Ore.1979). This Court takes a different view.

Mr. Nicholson, the Supervisor of Central Assessment for the State of Iowa testified that studies show that deferred taxes are not paid back because for capital-intensive companies, they either grow or are constant. *See* Davidson, Kirsch & Palast, *What Others Think, Utilities Accelerated Depreciation and Income Tax Allocation: An Empirical Study.* Public Utilities Fornightly—July 2, 1981. He concluded that investors are aware of this additional source of capital and therefore he included deferred taxes in arriving at the railroad's income stream. (Tr. 648–649)

The Court is of the opinion that the assumption that deferred taxes will continue to grow and actually will never be paid back is supported by the studies and logic. If deferred taxes are not added into the income stream, the plaintiff would have an increased flow of capital that would not be capitalized. On the other hand, if investments would be less than the depreciation, a negative deferred tax situation would develop where more taxes were actually being paid than would have been paid under the straight-line method, plaintiffs income would be reduced by that amount and the property value lowered accordingly. As it appears that a consistent underestimation of operating income will probably develop if it is not determined by taxes actually paid, and as there would be no prejudice over the long run to plaintiff if deferred taxes are not treated as an expense in arriving at income, the Court believes that the plaintiff has failed to establish by a preponderance of the evidence that the defendant erred in computing operating income by using taxes actually paid and not treating deferred taxes as an expense.

However, for the period of time involved, there is an extraordinary item of deferred taxes that does not fit within the above analysis. Beginning in 1981, the Internal Revenue Service (IRS) permitted railroads to write off the undepreciated base in their track accounts over a five year period. Burlington Northern elected to use an accelerated depreciation method. In 1981, this IRS regulation created a deduction of $400,000,000 and reduced income taxes by over $192,000,000. No additional money was invested. The IRS just permitted a shorter period to write off investments previously made. Deferred taxes were created by the difference between the deduction allowable under the double declining balance method and the straight-line method. These deferred taxes are not within the courts justification for the use of taxes actually paid. The railroad did not invest any additional capital. It just accelerated

the depreciation on previous investments in track and roadbed. The deferred taxes on this item should not be added back into the income stream.

The Court holds that the plaintiff has not shown by a preponderance of the evidence that the Department erred in its treatment of deferred taxes except to the extent that it included therein the extra ordinary item discussed above.

### B–3.  In treating current liabilities.

■ One of the Department's expert witnesses, Dr. Martin Gruber, added current liabilities into the value arrived at under the income method. Neither Dr. Schoenwald nor Mr. Nicholson did so. Current liabilities were not used in the final calculations of the Department under the income method. As the Court has used such calculations as a starting point and examined them with respect to the errors urged by plaintiff, the Court need not determine whether Dr. Gruber's add-on of current liabilities is improper. Defendant does not urge that this add-on should be made. If a determination were required, the Court would find that current liabilities should not be added.

Plaintiff has established by a preponderance of the evidence that it is not proper to adjust the income stream to reflect current liabilities.

### C.  In the stock and debt method.

The stock and debt approach to value is based upon the premise that the aggregate market value of a company's outstanding stock and debt reflects the market value of the company's assets. Plaintiff challenges the Department's (1) determination of the value of Burlington Northern's common equity; (2) treatment of current liabilities; and (3) treatment of deferred taxes.

### C–1.  Valuation of the railroad's common equity.

As Burlington Northern Railroad is a subsidiary of a holding company, Burlington Northern Inc (BNI), which also includes companies engaged in oil and gas exploration and production, forest products, coal and other minerals, land, trucking and air freight, there is no public trading in the stock of Burlington Northern Railroad as such. Only BNI's stock is publicly traded. In attempting to determine the market value which investors purchasing BNI's stock have placed on the operating railroad properties, one must separate the railroad stock from that of the other subsidiaries. An investor would, in purchasing BNI stock consider the income streams and risks attributable to each of these major affiliates and the potential of each in terms of dividends or growth, quality of earnings, the industry involved, the risk of such a company and its relationship to the total assets of the holding company.

■ In its final computations, the Department arrived at the market value of the equity in Burlington Northern by multiplying the market value of the equity in BNI—a known figure—by the ratio of the book value of investment in the railroad operating property to the book value of the investments in BNI. (89.42%). The Department's expert Dr. Gruber arrived at the market value of the equity in Burlington Northern by multiplying the total equity of BNI "by the ratio of total income available to equity of the rail subsidiary to the income available to the equity of the holding company." (EE p. 7)

The most that can be said for these techniques is that they are simple and objective. The Court has already stated that depreciated cost has little or no relationship with value. Book value as used here is equally worthless. As pointed out above an investor takes many factors in addition to income into consideration in determining the market value of a stock. Reliance on one factor could seriously distort the market value an investor would place on the stock of the railroad subsidiary. For instance, BNI owns the largest coal reserves in the United States except for the government. Those reserves would contribute significantly more to the equity value of BNI than the limited income from the coal

properties. The Court believes the simplistic methods urged by the Department fail to properly account for the fundamental variances among BNI's various holdings, and fails to consider other factors that can influence an investor's opinion as to the market value of stock.

The price/earnings (P/E) multiple used by Dr. Schoenwald and Mr. Batkin, expert witnesses for plaintiff, reflects an investor's total interest in a stock including risk, growth, earnings, as well as other factors that may apply to a particular industry and a specific company. Lehman Brothers, of which Mr. Batkin is a managing director, was asked to "determine the average market value which investors would have placed on the net assets of the non-rail properties of Burlington Northern Inc. during the calendar year 1981." Lehman used indices of companies that it determined were in comparable businesses with each of the various BNI subsidiaries. With the exception of the coal and mineral business, Lehman used the average price/earnings multiple for 1981 for the companies selected as comparable. The estimated market value for the coal and mineral business was valued at 2¢ a ton for 15 billion tons of reserve—or $300,000,000.

Sometime later Lehman used a similar technique to arrive at P/E ratios to be applied to the BNI railroad property. By using the six major railroad systems in the country, Lehman arrived at a P/E multiple of 8.4. By eliminating Union Pacific which received almost one-half of its earnings from gas and oil, the P/E ratio dropped to 6.3. Norfolk and Southern, which was a well respected almost pure railroad, had a P/E ratio of 6.1. Because Burlington Northern was not viewed by Lehman as being of an equally high quality, Lehman used the P/E ratio of 5 as an approximation for this railroad.

Dr. Schoenwald applied a P/E ratio of 14 to the income derived from all of BNI's non-railroad subsidiaries, relying on Standard & Poor's security analyst handbook, and applied a P/E ratio of 4 to the railroad operating income "since railroad income is valued relatively poorly and since BN had performed more poorly than other railroads."

The evidence convinces the court that the best way to determine the market value investors would place on the Burlington Northern railroad property in deciding whether to purchase BNI stock is by the application of the appropriate P/E ratio to the income derived from the railroad operation and each of the other subsidiary operations individually. It would be highly unlikely that the total of such estimated market values would equal the actual market value of BNI common equity, a known figure, as it is publicly traded. It therefore appears that a further calculation is required. The total value that has been computed should be compared with the market value of BNI common equity and the common equity of the railroad property increased or decreased by the percentage of difference.

Having determined the most appropriate method to arrive at the market value of the railroad's common equity, under the opinion of the Circuit Court of Appeals, the Court must now determine the appropriate P/E ratio to be used in arriving at the value of the common equity of the railroad property and each of the subsidiaries of BNI. The Court agrees with the classification of BNI's non-rail subsidiaries found in Exhibit I to Plaintiff's Exhibit 19. The Court understands that there is no dispute over the income stream assigned to each of the subsidiaries. The Court also accepts the 2¢ per ton value for coal reserves as a proper valuation for the coal and mineral business.

The selection of the appropriate P/E ratio is a crucial decision in the evaluation process. Although concrete figures are used, subjective judgment is necessary in deciding what companies to use as comparables and where to place Burlington Northern in the comparison with those companies to arrive at the appropriate P/E ratio. Had the Department used the method approved by the Court, considerable deference would have been accorded the ex-

pertise used in determining comparable companies and the proper place the specific BNI subsidiary occupied in relation to those companies and their established P/E ratios. As the Department used other techniques not approved by the Court, the Court must determine from the evidence the P/E ratio to be applied to each BNI subsidiary including the railroad for the years in issue.

The Court accepts as comparable the companies used by Lehman and listed in Plaintiff's Exhibit 19. (All subsidiaries except the railroad and coal and mineral.) However, as most of them are considerably larger than the comparable BNI subsidiary and are leaders in the particular industry, the court believes that the application of the average P/E ratio of those companies to BNI subsidiaries would tend to inflate the market value of the common equity of the BNI subsidiary. Rather than being in the middle of the group the court is of the opinion that the BNI subsidiary would more likely be in the bottom third. Therefore in computing the appropriate P/E ratio to be used in determining the market value of the common equity of each BNI subsidiary, the selected comparable companies may be used, but the P/E ratio should be set at the lower 1/3 level rather than in the middle of the group. Although Exhibit 19 relates to 1981 only, the P/E ratios established by use of this exhibit may also be applied to 1982.

The P/E ratio to be applied to the railroad operating income is 5.5 to 1. Dr. Schoenwald's multiple of 4 is not acceptable. Lehman's discount of the P/E ratio for operating railroads to 5 for the performance of Burlington Northern is not justified under the evidence. While its operation does not equal that of the most efficiently operated lines, a lowering of the P/E ratio to 5.5 sufficiently incorporates its lesser performance.

In this area the Court has attempted to provide the principles, methods and, where necessary, the specific figures that will enable the parties to use their expertise to compute the market value of the common equity prospective investors would attribute to each of BNI's subsidiaries. The figures for the subsidiaries, including the railroad property, should be totalled and compared with the known market value of the common equity of BNI. The market value of the common equity of the railroad property should be increased or decreased in proportion to the difference.

### C-2. In the treatment of current liabilities

■ The Department, in attempting to arrive at the value of the railroad operating property by the stock and debt method, included net current liabilities[1] on the righthand side of the balance sheet. The railroad included current liabilities, but also deducted current assets which exceed current liabilities by approximately $200,000,-000. The different treatment of current assets and liabilities accounts for an evaluation difference of $912,000,000.

The Court is unable to understand how either of the above methods is very helpful in attempting to arrive at the unit value of the railroad operating property. If the Department's method is accepted, you arrive at a total for the asset side of the balance sheet which includes current assets, like accounts receivable which do not contribute to the operating income and should not be included in the unit valuation procedure. In addition, the higher the amount of current liabilities outstanding, the higher the unit value of railroad operating property when there does not appear to be any rational relationship between the two figures. If the railroad's method is adopted, the higher the ratio of current assets to liabilities, the less valuable the railroad operating property as a unit, because, under the railroad's approach, the value is decreased by the excess of current assets over liabilities. Neither method makes much sense to

1.

| Current liabilities | 788,318,000 | due in one year | (76,296,000) |
| Equipment obligations and other [longterm debt] | | | 712,022,000 |

the Court and the results seem unrelated and incongruous.

In its post trial memorandum, the railroad argues as follows:

Mr. Nicholson and Dr. Gruber simply add current liabilities to the gross stock and debt value of the company. Dr. Schoenwald, on the other hand, nets current liabilities with current assets to get something akin to a net working capital amount.

The working capital position of any company is a function of its production cycle, which is the period from the purchase of raw materials through the conversion into salable goods and the billing process until the collection of the receivable. Although the cycle takes different forms in different businesses, the longer it is—the greater the burden. Thus, a company with high current liabilities and high current assets is not more valuable with all other things being equal. Therefore, only the net working capital position is relevant to the valuation process.

Perhaps a more dramatic illustration would involve 100 persons each of whom owed $100 to another person and was owed $100 by another party. Under the balance sheet identity of the Stock and Debt Approach, the $100 liability would create the appearance that there was a taxable asset of $100. Clearly, each person's net position is "zero". At a tax rate of $2, the taxing authority would claim $200 which exceeds any one of the original debts (or assets) involved in this illustration. This result is unfair and unreasonable, and simply derives from the methodology being used. It can, however, be rectified properly and easily by considering the net working capital position.

The excess of current assets over current liabilities is something "akin to net working capital". In the Court's opinion net working capital should be included in attempting to evaluate the railroad's operating property. However, the Court does not agree with the way it was used by the railroad. The railroad deducted net working capital

from the stock and debt side of the balance sheet, thus lowering the value of the railroad operating property. The Court believes that net working capital should add to the value of the operating property rather than decrease it. The Court believes this is consistent with the railroad's concept of the stock and debt method. Dr. Schoenwald testified:

This method assumes that the value of taxable property may be determined by summing the market value of all of a company's outstanding securities, plus the value of leased equipment and other obligations, *less a deduction for non taxable assets.* (Emphasis added.)

Although net working capital is not property directly subject to real estate taxes, it does contribute toward the operating income flow of the railroad and should be included when the unit value method is being used. To deduct all of the current assets would confuse the valuation of particular assets with the unit method and would not be proper. By including working capital as contributing to the income flow, you have in effect deducted non-taxable assets. If you limit operating railroad property to just real and personal property and eliminate working capital as contributing to the stream of income from operations, you are departing from the unit value method of arriving at the value of railroad operating property and turning to the valuation of property as such.

Other than the railroad's reference to the working capital, the Court has found nothing in the filings of either party that would tend to support the Court's above analysis and conclusion. This result certainly does not adhere to the Department's view of the stock and debt method. While the Court found some comfort in the railroad's language, the Court's treatment of net working capital is opposite to the way the railroad treated working capital. It may very well be that the Court's lack of expertise in this area has caused the Court to take an erroneous approach to this important issue. However, when one keeps in mind that we are here trying to arrive at the unit value

of the railroad's operating property for purposes of taxation, rather than the total asset value for the sale or purchase, the method adopted by the Court seems most appropriate. The primary question is whether the Court is correct in treating net working capital as contributing to the stream of income from operations. If the Court is correct, net working capital is properly includible in arriving at the unit value of the railroad's operating property.

The Court finds that in valuing railroad property as a unit under the stock and debt method, current liabilities should be deducted from current assets and the resulting figure, approximating working capital, if positive, should be added to the remaining elements on the right hand side of the balance sheet. If negative, it should be deducted.

### C–3. Treatment of accumulated deferred income taxes.

■ In its stock and debt approach the Department adds to the aggregate market value of the railroad's securities the amount of accumulated deferred federal income taxes. The railroad takes the position that the value of these deferred taxes is already reflected in the market value of the securities. The Court agrees with the plaintiff.

The Court has adopted the price/earnings ratio as the proper way to value a company's equity under the stock and debt approach. That method presupposes that the price of a stock reflects its income-earning potential. Deferred taxes have some value to the company. In determining the appropriate P/E multiple to be used in determining the market value of the common equity, the Court gave consideration to the accumulated deferred federal income taxes. The Department's expert Dr. Gruber testified that there is considerable debate as to whether accumulated deferred federal income taxes should be included under the stock and debt approach. In order to be conservative he, like Dr. Schoenwald, did not add deferred taxes into his evaluation.

The Court finds that the plaintiff has established by a preponderance of the evidence that deferred federal income taxes are reflected in the market value of the securities and that they should not be included as a separate item under the stock and debt method.

The Court has attempted to consider all of the claims of the plaintiff relating to the railroad's true market value and to furnish all the principles and specific figures the parties will need in order to compute the true market value of the real property that is a part of the plaintiff's railroad operating property. The parties by utilizing their expertise can make the necessary computations with greater accuracy and ease than the Court. If the Court has not made all findings that are required, the parties can so inform the Court.

### ASSESSED VALUE OF BURLINGTON NORTHERN'S REAL PROPERTY

A pre-trial stipulation contained the final assessments on Burlington Northern according to the records of the Department. Mr. Nicholson testified at trial that certain errors in the final assessment were pointed out during discovery and that corrections had been made, all favoring the railroad. As an injunction has been in effect, recertification awaits a final determination of the court. The corrected assessment has been used by the parties. At the trial, the parties agreed that these corrected figures would be binding for these particular tax years.

The Court therefore finds that the assessed value of plaintiff's real property in Iowa is $34,105,774 for 1981 and $33,373,-092 for 1982.

### THE ASSESSED VALUE OF ALL OTHER COMMERCIAL AND INDUSTRIAL PROPERTY IN THE SAME ASSESSMENT JURISDICTION

■ The parties have stipulated as to the assessed value of (1) locally assessed commercial and industrial property for 1981 and 1982; (2) locally assessed property, traditionally considered as personal property

taxed in Iowa as real property for 1981 and 1982; and (3) the total appraised value of all utilities, except railroads, for 1981 and 1982. The parties disagree as to which stipulated figures should be included as components in the right hand side of the formula:

| Assessed Value of Rail Transportation Property | Assessed Value of All Other Commercial and Industrial Property |
|---|---|
| Must Not Exceed by 5 per cent | |
| True Market Value of Rail Transportation Property | True Market Value of All Other Commercial and Industrial Property |

The railroad takes the position that only commercial and industrial *real* property assessed locally and all centrally assessed utility property should be included. The Department includes, in addition, the locally assessed personal property taxed as real estate. The Court agrees with the Department.

The Eighth Circuit Court of Appeals stated on this issue:

The court cannot require Burlington Northern to extend its equalization complaint to personal property. However, in making the section 306(1)(a) ratio comparison, the court may include all other commercial and industrial property, real and personal, assessed by the Department of Revenue. Section 306(1)(a) requires comparison of property "in the same assessment jurisdiction * * *." Since the Department of Revenue assesses utility properties as a unit, without differentiating between real and personal, it would be very difficult for the court to segregate the real property for purposes of comparison. And because the Department of Revenue treats personal property as real property, with no valuation rollbacks, this comparison is not unfair. It would, however, be improper to include Burlington Northern's personal property, which is entitled to a rollback, in the ratio comparison.

*Burlington Northern R. Co. v. Bair*, 766 F.2d at 1225.

While the Court of Appeals allowed the railroad to separate out its real property on its equalization claim, it did not say that only locally assessed real property should be used. The locally assessed personal property taxed as real property must be included. As the Court of Appeals pointed out:

The relevance of classification as personal or real property for tax purposes is that personal property receives preferential tax treatment.

*Ibid.* at 1224.

Commercial and Industrial personal property taxed locally as real property does not receive the tax preference given personal property. It is taxed as real property and is a proper component of the formula. If such property is not included, you do not get a fair comparison of the properties taxed as real estate.

The Court finds that the following schedule constitutes the assessed values of properties to be used in computing the formula set forth above.

| 1981 | 100% Market Value As Assessed | § 427A(1) Assessment Limitation Factor %[2] | Assessed Value |
|---|---|---|---|
| COMMERCIAL Land and Bldgs. [Comm. Real Prop.] | $ 9,007,527,000 | [87.84%] | $ 7,912,418,000 |

**2.** Under Section 441.21, Code of Iowa, the plaintiff's real rail transportation property is entitled to the assessment limitation factor applied to either commercial real property or industrial real property, depending on which is lower.

For the 1981 and 1982 tax years, the plaintiff's real rail transportation property was credited with the commercial assessment limitation factor, or 87.84% in tax year 1981, and 91.63% in 1982.

| 1981 | 100% Market Value As Assessed | § 427A(1) Assessment Limitation Factor %[2] | Assessed Value |
|---|---|---|---|
| COMMERCIAL Machinery and Equip. [Comm. Per. Prop. Taxed as Real Prop.] | $ 198,684,000 | [100%] | $ 198,684,000 |
| INDUSTRIAL Land and Bldgs. [Ind. Real Prop.] | 2,047,336,000 | [96.96] | 1,985,136,000 |
| INDUSTRIAL Machinery & Equip. [Ind. Personal Prop. Taxed as Real Prop.] | 1,705,670,000 | [100] | 1,705,670,000 |
| UTILITY PROPERTY [All Prop., Real & Per., Taxed as Real Property] | 4,983,001,595 | [100] | 4,983,001,595 |
| | $17,942,218,595 | [93.55] | $16,784,909,595 |

| 1982 | 100% Market Value As Assessed | § 427(a)(1) Assessment Limitation Factor % | Assessed Value |
|---|---|---|---|
| COMMERCIAL Land and Bldgs. [Comm. Real Prop.] | $ 9,213,440,049 | [91.63] | $ 8,442,275,117 |
| COMMERCIAL Machinery & Equip. [Comm. Per. Prop. Taxed as Real Prop.] | 243,119,066 | [100] | 243,119,066 |
| INDUSTRIAL Land and Bldgs. [Ind. Real Prop.] | 2,159,675,449 | [100] | 2,159,675,449 |
| INDUSTRIAL Mach. & Equip. [Ind. Pers. Prop. Taxed as Real Prop.] | 1,992,841,952 | [100] | 1,992,841,952 |
| UTILITY PROPERTY [All Prop., Real and Per., Taxed as Real Prop.] | 5,145,795,656 | [100] | 5,145,795,656 |
| | $18,754,872,172 | [95.89] | $17,983,707,240 |

## TRUE MARKET VALUE OF ALL OTHER COMMERCIAL AND INDUSTRIAL PROPERTY

In it's Ruling and Order of March 14, 1985, in discussing the true market value of all other commercial and industrial property, the Court stated:

Contract sales are expressly excluded from consideration in appraising real property values in Iowa because such sales are *deemed* not to reflect the market value of the property. See Iowa Code § 441.21(1)(b).

P. 17 (emphasis supplied), and

The Court finds that on the evidence presented defendant's appraisals more accurately reflect one-hundred percent market value of all commercial and industrial property than does the skewed and limited sales assessment evidence presented by plaintiff. Under these circumstances the Court need not look to the sales assessment ratio data presented by plaintiff as the sole, definitive measure of the sales assessment ratio for all commercial and industrial property. *See Atchison, Topeka & Santa Fe Ry. v. Lennen,* 732 F.2d 1495, 1503–04 (10th Cir.1984); *Ogilvie v. State Bd. of Equalization,* 492 F.Supp. 446, 451–52 (D.N.D.

1980), *aff'd,* 657 F.2d 204, 209 (8th Cir.), *cert. denied* 454 U.S. 1086, 102 S.Ct. 644, 70 L.Ed.2d 621 (1981).

Plaintiff has in no way shown that defendant's appraisal of all commercial and industrial property was arbitrary or capricious. The Court, therefore, concludes that defendant's appraisals of all commercial and industrial property for tax years 1981 and 1982 will be *deemed* to represent one-hundred percent of true market value.

(Emphasis supplied.)

The Court believes that the inappropriate use of "deemed" in the above quotes caused the Court of Appeals to state:

In *making findings of fact on assessed values and true market values, the district court may not rely on Iowa Code § 441.21(1) to hold that assessed values equal true market values.* There is always a subjective element to valuation. While section 441.21(1) precludes de jure discrimination, there remains the possibility of de facto discrimination if, as a result of error or purpose, the assessed values vary from the true values. Section 306(2)(e), which covers the situation in which separate data for commercial and industrial property cannot be adduced, implies that the *court must rely on actual evidence rather than a statutory definition such as section 441.21(1).*

(Emphasis supplied.)

■ This Court did not rely on the requirements of the Iowa Code that real property be valued at 100% of true market value to create a presumption or even an inference that that is what the Department did. Nor did this Court intend to base its findings on the statutory definition of true market value. However, the Court does find Section 441.21(1)(b),[3] which defines market value and identifies matters to be considered or not considered, is supported by other evidence and does contain an accurate and generally accepted definition. The evidence presented at trial supports the exclusion of contract sales as an abnormal sale not reflecting market value.

The Court intended to make findings of fact upon the *actual* evidence presented at trial. The Court finds that the sales assessment ratio studies, the only evidence presented by the railroad, does not accurately reflect the sales assessment ratio of all industrial and commercial property in Iowa because it contains many real estate contract sales, which the Court finds are abnormal sales not reflecting actual market value and because the studies are limited to urban and rural commercial real property. The defendant offered evidence tending to establish that the state has reached its goal of valuing the property at 100% of true market value. Although there is some duplication of the above findings, rather than amplify them further, the Court will include herein portions of the previous unreported Ruling and Order.

Plaintiff presented no evidence concerning the appraisal of commercial and industrial personal property; commercial and industrial personal property taxed as real property; and utility property. Instead, plaintiff presented 1981 and 1982

---

**3.** b. The actual value of all property subject to assessment and taxation shall be the fair and reasonable market value of such property except as otherwise provided in this section. "Market value" is defined as the fair and reasonable exchange in the year in which the property is listed and valued between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and each being familiar with all the facts relating to the particular property. Sale prices of the property or comparable property in normal transactions reflecting market value, and the probable availability or una- vailability of persons interested in purchasing the property, shall be taken into consideration in arriving at its market value. In arriving at market value, sales prices of property in abnormal transactions not reflecting market value shall not be taken into account, or shall be adjusted to eliminate the effect of factors which distort market value, including but not limited to sales to immediate family of the seller, foreclosure or other forced sales, contract sales, discounted purchase transactions or purchase of adjoining land or other land to be operated as a unit.

sales assessment ratio studies of urban and rural real property published by defendant pursuant to Iowa Code § 421.-17(6), and similar sales assessment ratio data on industrial property for 1980, 1981, and 1982, to show that all commercial and industrial property is appraised at less than true market value. According to plaintiff, under section 306(2)(e) the sales assessment ratio of urban commercial real property (taken from the published studies) and the sales assessment ratio derived from the industrial data must be considered as conclusive proof that defendant appraises *all* commercial and industrial property at only approximately eighty-nine percent of true market value.

Defendant challenges the accuracy of the results from the published studies and industrial data. The sales assessment ratio study data offered by plaintiff is skewed, according to defendant, because it contains data on abnormal transactions. The published sales assessment ratio studies include data on contract sales. Contract sales are expressly excluded from consideration in apprising real property values in Iowa because such sales are deemed not to reflect the market value of the property. *See* Iowa Code § 441.21(1)(b). Defendant's expert testified that contact sales are not commonly considered in sales assessment ratio studies because the contract sales price does not reflect market value. The evidence shows that contract sales assessment ratios were very often lower than deed sales assessment ratios. In addition, the sales assessment ratio data on industrial property includes data on such things as sales of vacant buildings, which defendant's expert stated would not be considered in a reliable sales assessment ratio study.

Defendant also contends that plaintiff's method for establishing the sale assessment ratio of all commercial and industrial property is flawed because the sales assessment evidence offered by plaintiff concerns only commercial urban real property and industrial property.

Plaintiff requests that the Court extrapolate from the data on these two classes of property to establish the sales assessment ratio for all commercial and industrial property.

The Court agrees with defendant that the sales assessment ratio evidence presented by plaintiff should not be used to determine the sales assessment ratio for all commercial and industrial property. The data presented is skewed because it includes data on transactions not reflecting true market value. The Court also does not feel that the limited data offered by plaintiff can properly form the basis for the determination of the sales assessment ratio of all commercial and industrial property.

Furthermore, plaintiff did not show that defendant's appraisal process is flawed. Defendant's experts testified that every effort is made to appraise all commercial and industrial property at one-hundred percent of market value. One of defendant's experts, Brian Bruner, testified that defendant's appraisal of commercial real property takes into account reliable data from the sales assessment ratio study, numerous independent appraisals, and reviews made of local assessor's records and assessment levels. Industrial property is appraised in much the same manner, with a higher degree of review made of local assessor's actions. All local assessors continually receive the benefits of educational materials and programs to assist them in maintaining accurate appraisals.

*Burlington Northern Railroad Co. v. Bair,* No. 83–100–A, slip op. at 16–18 (SD IA March 14, 1985).

Although it would be highly unlikely that the Department was successful in assessing all other commercial and industrial property at 100% of its true market value, the Court need not and is not making such a finding. The Court of Appeals stated:
* * * the Department of Revenue assessments are entitled to great deference. We hold that the burden is on Burlington Northern, as the party at-

tacking the accuracy of the Department values, to show by a preponderance of the evidence what the accurate values are.

*Burlington Northern Railroad Co. v. Bair,* 766 F.2d at 1226.

The railroad has not met its burden. The only evidence it offered was not satisfactory to the Court for the reasons given above. The Court concludes, on the basis of the evidence presented and by giving deference to the assessments of the Department of Revenue that the assessed values and market values of all other commercial and industrial property are the same.

## CONCLUSION

The Court in this ruling has attempted to set forth principles, specific figures, findings of facts and conclusions of law that will enable the parties, by using their expertise, to arrive at the four factors to be included in the formula set out above. The computation will reveal whether the ratio of the assessed value of the railroad's real property to its true market value is at least 5% greater than that ratio of all other commercial and industrial property in Iowa, as identified herein.

As the Court cannot determine at this time which is the prevailing party, the Court directs the plaintiff to take the responsibility for the preparation of an Order for Judgment in accordance with this Ruling and Order and submit the same to the defendant for comment or approval. Any questions about the Ruling and Order may be submitted to the Court.

IT IS SO ORDERED.