No. 87-264

IN THE SUPREME COURT OF THE STATE OF MONTANA

1988

---

PUGET SOUND POWER & LIGHT COMPANY,

        Petitioner and Respondent,

   -vs-

THE DEPARTMENT OF REVENUE OF THE
STATE OF MONTANA,

        Respondent and Appellant.

---

APPEAL FROM:  District Court of the First Judicial District,
                In and for the County of Lewis & Clark,
                The Honorable Gordon Bennett, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Larry G. Schuster argued, Dept. of Revenue, Helena,
        Montana

    For Respondent:

        Bruce R. Toole; Crowley, Haughey, Hanson, Toole &
        Dietrich, Billings, Montana
        Ronald L. Berenstain argued; Perkins & Cole, Seattle,
        Washington

---

Submitted:  March 22, 1988

Decided:  June 14, 1988

Filed: JUN 1 4 1988

*Ethel M. Harrison*

---

Clerk

Mr. Justice R. C. McDonough delivered the Opinion of the Court.

This appeal involves an ad valorem property tax valuation. The respondent, Puget Sound Power and Light Company, (Puget) filed a petition with the State Tax Appeal Board (Board) claiming that the Department of Revenue (Department) overvalued Puget's property for 1983. The petition raised five issues on the Department's appraisal methods, and the Board held for the Department on all issues relevant to this appeal. Puget appealed the Board's decision to the District Court, and the District Court reversed the Board on such issues. The Department appeals the District Court decision, and Puget raises one issue on cross-appeal. We reverse on the issues raised on appeal and affirm the issue raised on cross-appeal.

The issues raised by the Department on appeal are as follows:

(1) Did the Court err by concluding that the Department may not treat construction work in progress (CWIP) as a separate indicator of value within the unit method of valuation?

(2) Did the Court err by concluding that the Department may not include an accumulated deferred income tax reserve as a liability within the stock and debt indicator?

(3) Did the Court err by concluding that the Department may not remove the value of the townsite property by subtracting the locally assessed value of the townsite property from the allocated Montana value?

On cross-appeal Puget raises one issue: Did the District Court err by refusing to adjust the stock and debt

indicator to reflect the amount of CWIP not expected to go into service?

Before addressing these issues, a brief discussion of the pertinent facts and law is necessary. The parties agree that Montana law requires the Department to appraise Puget's taxable property at its market value. Section 15-8-111, MCA. The statute defines market value as the value a willing buyer would give to a willing seller, "neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts". Section 15-8-111(2)(a), MCA. The method used for finding what the statute defines as market value is left to the Department.

The Department's administrative rules implement the requirement to find market value in central assessments such as the one at issue here primarily by use of the "unit method of valuation". ARM § 42.22.111. The aim of this method is to find the value of the property as a going concern. The method generally values property in three different ways: (1) cost indicator, (2) capitalized income indicator, and (3) stock and debt indicator. Each method purports an approximate total value (both in and out of Montana) of the company appraised.

The cost indicator, (as used in this appraisal), equates a company's value with the cost of its depreciated original cost of investment. The capitalized income indicator values the company by capitalizing the present value of future income to be produced by the property. The stock and debt indicator values the property using the basic accounting principle; assets = liabilities + owner's equity. Under this last indicator, the appraiser attempts to ascertain the amount of liabilities owed and the amount of equity

3

outstanding. The sum of these two figures should necessarily equal assets, and thus the company's value.

In this case, the Department arrived at Puget's value using the three different methods as follows: (1) cost indicator = $1,044,297,534, (2) capitalized income indicator = $808,843,951, (3) stock and debt indicator = $921,199,487. Instead of then relying on any one of these valuations, the Department used a portion of each to determine fair market value. In this case, the Department added 40% of the cost indicator, to 50% of the income indicator, to 10% of the stock and debt indicator to arrive at an assessed value of $914,260,940. There is no argument as to the weighting of these indicators. The Department then added the market value of Puget's construction work in progress, $475,793,627, to calculate total value of Puget. This aggregate figure was then multiplied by an agreed percentage to arrive at the value of Puget's property in Montana.

At this point in the appraisal, the value of Puget's "non-operating" property must be subtracted from the total value of the Montana property so that the appraisal will reflect only Puget's Montana operating property. In this case, the townsite property (Puget's housing for employees) was properly classified as non-operating property, and its value, as appraised by Rosebud County (local situs) in the same manner as other residences, was subtracted from the total value of Puget's Montana property.

Two of the issues here concern the Department's implementation of the unit method. The first involves valuing construction work in progress (CWIP) outside the unit method's traditional indicators, and the second relates to inclusion of tax deferrals in the stock and debt indicator. The third issue concerns the use of Rosebud County's appraisal of the townsite property for removal of the

4

townsite value from the value of all Puget's Montana property. The issue on cross-appeal involves Puget's contentions on the treatment of CWIP not expected to go into service in the stock and debt indicator.

This Court has stated previously the standard to be employed by district courts reviewing decisions by the Board:

> The District Court as a reviewing court may reverse or modify the decisions of the State Tax Appeal Board and remand the case for further proceedings if substantial rights of the appellant have been prejudiced because the administrative findings, conclusions, or decisions are clearly erroneous in view of the reliable, probative and substantial evidence of the whole record or are arbitrary, capricious, or characterized by an abuse of discretion.

Department of Revenue v. Grouse Mountain Development (Mont. 1985), 707 P.2d 1113, 1115, 42 St.Rep. 1642, 1643-44. This standard applies to all the findings and conclusions reviewed in this appeal.

Issue I.

The District Court concluded that the Department abused its discretion by failing to integrate the value of CWIP into the three unit value indicators, and that the Board's approval of separate treatment for CWIP was clearly erroneous. We reverse.

First, the District Court failed to apply the controlling rule in reviewing the Board's decision. In this regard, the lower court quoted as controlling an early version of ARM § 42.22.111, the rule which defines the traditional indicators in the unit method of valuation, as follows:

> "(1) the unit method of valuation will be used to appraise centrally assessed companies whenever appropriate. When applying this method, the

> department will use commonly accepted methods and techniques of appraisal to determine market value. <u>The</u> <u>application</u> <u>of</u> <u>the</u> <u>unit</u> <u>method</u> <u>may</u> <u>include</u> <u>a</u> <u>cost</u> <u>indicator,</u> <u>capitalized</u> <u>income</u> <u>indicator,</u> <u>and</u> <u>a</u> <u>market</u> <u>indicator</u> <u>(stock</u> <u>and</u> <u>debt)</u> <u>of</u> <u>value</u> <u>when</u> <u>sufficient</u> <u>information</u> <u>is</u> <u>available.</u> <u>If</u> <u>the</u> <u>department</u> <u>determines</u> <u>an</u> <u>indicator</u> <u>does</u> <u>not</u> <u>reflect</u> <u>a</u> <u>company's</u> <u>market</u> <u>value</u> <u>or</u> <u>information</u> <u>is</u> <u>not</u> <u>available,</u> <u>it</u> <u>may</u> <u>substitute</u> <u>net</u> <u>scrap</u> <u>value,</u> <u>net</u> <u>salvage,</u> <u>or</u> <u>other</u> <u>accepted</u> <u>indicators</u> <u>of</u> <u>value.</u> (Emphasis added)."

See ARM § 42.22.111 (1980). The lower court then noted in footnote 6 of its memorandum that:

> In 1984 the last sentence of 42.22.111(1) was amended to read as follows: 'If the department determines that an individual indicator, the unit method of valuation or other method of valuation does not reflect a company's market value or that information is unavailable, it may adopt a different method or methods of valuation, including but not limited to net scrap, net salvage, corridor value in the case of railrods, or <u>any</u> <u>combination</u> <u>of</u> <u>methods</u> <u>of</u> <u>valuation</u> which reflects the company's market value.' (Emphasis added) Thus, the department now has explicit authorization to combine the unit and summation methods of valuation if, in its discretion, it determines that it is necessary to determine the correct market value of a company.

A review of the history of this rule reveals that the amendment referred to by the lower court was adopted in 1982, not 1984. Notice of the proposed amendment was published at pages 87-90 of the 1982 Montana Adminstrative Register, issue no. 2, and notice of the actual amendment of the rule appears on page 705 of the 1982 Montana Adminstrative Register, issue no. 7. After the amendments were made the new rule was published in the 1982 edition of the Adminstrative Rules of Montana, and subsection (3) of the amended version reads as follows:

6

(3) This rule shall be effective for all reporting years ending December 31, 1981, and therefter.

See ARM § 42.22.111(3) (1982). Thus, the District Court erred by not applying ARM § 42.22.111 as it existed after the amendments made in 1982. The amended rule gives the Department the discretion to combine other methods of valuation with the unit method of valuation, and the Board's decision cannot be clearly erroneous because of the Department's interpretation of this rule.

The District Court decision also rests on its conclusion that the Board must be reversed because the Department failed to demonstrate that the unit method was inappropriate to the appraisal made in this case. The Board approved treatment of CWIP outside the unit method's three indicators because credible testimony by an appraiser indicated that capitalization of CWIP was too speculative to render an accurate figure for use in the income indicator. Puget offered testimony by another appraiser to the effect that inclusion of CWIP in the income indicator was practical and appropriate. However, the Board is the expert and the fact finder on valuations, and the issue before the Board depended on the weight to be given to conflicting testimony. We hold that even though Puget presented opinion evidence that it was proper to value CWIP in the income indicator, such evidence is not enough to demonstrate that the Board decision on this issue is clearly erroneous. The opinion of the Department's appraiser provided substantial evidence that valuation outside the three indicators was a better way to approximate market value. Thus, the District Court erred in holding that the Department failed to demonstrate that the unit method was inappropriate.

The statutory mandate that the Department value according to market value is couched in general terms. The Department's rule primarily prescribes the unit method for finding market value, but this adoption should not be construed so strictly that the Board is unable to adjust the method when credible evidence demonstrates that the adjustment would better reflect market value. This is the purpose of the last sentence of the regulation. Thus, we reverse on this issue.

## Issue II.

The District Court reversed the Board on two findings of fact and one conclusion of law in regard to inclusion of tax deferrals in the stock and debt indicator. We reverse.

The Board found that the tax deferral account was a true liability. The District Court reversal was based on its finding that the account was merely an accounting device which reflected value owed on the books but did not constitute an actual liability. The relevant evidence on this issue is from the parties' appraisal experts.

The Department's expert testified that deferral reserves were "tax free loans from the government and that they're an obligation reflected in some manner in the assets of the company". On the other hand, Puget's expert stated that the deferral account:

> should be included in the stock and debt at its fair market value, and that fair market value is zero because deferred taxes do not trade in open market. There is not a market for that. There is a market for stocks. There is a market for debt. Things like that do trade on the open market. You can measure them, but there is no market for Deferred Federal income tax or unamortized investment tax credit. It's strictly an accounting convention to record for the differences in timing of various intricacies of the Federal income tax development and its not something that changes. ...

8

> If there is any effect in the stock and debt approach, if there is any effect in it, it is captured most likely right up in the stock price because prudent investors are out there and they know what's going on, too.

In regard to this issue, the parties agree to the following: the reserve account results from "normalized" accounting in Puget's books. The records are normalized in the sense that the difference in value between the accelerated depreciation deductions Puget actually took, and the lower straight line depreciation deductions Puget could have taken, is recorded in the reserve account as tax deferrals.

The tax deferrals are not presently counted as income to Puget when rates are set. Conversely, in the future if Puget's exhaustion of its depreciation deductions results in greater tax liability, depletion of the reserve account occurs and the loss is not counted as a reduction in income when rates are set. Thus, rates are not reduced to reflect the added income when the deductions are taken, and they are not increased to reflect the loss of income when the deductions are used up.

The District Court's Memorandum agrees with the analysis set out above, and on the basis of this analysis the District Court concluded:

> The deferred tax account is merely an accounting device used to normalize income for book purposes. It does not represent a true liability.

Also important to the District Court's resolution of this issue was its finding that "the amount of the deferred tax account is never considered in determining the amount of taxes an entity owes".

9

The cases cited in the briefs on appeal generally concern double-counting the value of deferrals in the indicator at issue. See In the Matter of Southern Railway (N.C. 1985), 328 S.E.2d 235, Burlington Northern R. Co. v. Bair (S.D. Iowa 1986), 648 F.Supp. 91; Pacific Power & Light Co. V. Department of Revenue (Ore. 1979), 596 P.2d 912. In Southern Railway, the North Carolina Supreme Court disallowed the taxing authority's inclusion of capitalized deferral income in the income indicator reasoning that the agency had already capitalized income from assets purchased with deferral income. Southern Railway, 328 S.E.2d at 247. In Bair, the taxing authority included the deferrals in the stock and debt indicator. The U.S. District Court reversed because the value of the deferrals was already reflected in the market value of Burlington Northern's common equity as derived from the use of a price-earnings ratio. Bair, 648 F.Supp. at 101. In Pacific Power, the Court disallowed valuation of deferred taxes in the income indicator because the value of the deferrals would already be recognized in a buyer's perception of the property's value as a result of the company's use of normalization accounting. Pacific Power, 596 P.2d at 927-28.

The current case is similar to the cases cited above in that Puget's expert stated that if the reserve account had any value, it was already reflected in the price of Puget's stock. However, the Department's expert held the opinion that the reserve account did represent value, and that this value was properly included in the stock and debt indicator by adding the dollar amount held in the reserve account as a liability. Thus, the expert testimony is conflicting as to whether the reserve account has any value outside of its effect on the price of the stock.

10

We reverse because the parties agree that the account represents value to Puget derived from deductions which increase income without reducing Puget's rate of return. The theory that the value is already reflected in Puget's stock because the reserve increases the value of Puget's stock is plausible. But equally plausible is the theory that the value is not reflected in the stock, or actually reduces the value of the stock, because the reserve must serve to mitigate the loss of deductions in the event that Puget has a lack of new equipment to depreciate due to inadequate continuous reinvestment, or because of a static capital base. Thus, the District Court incorrectly substituted its own judgment for that of the Board on a question of fact. Section 2-4-704, MCA.

The District Court's decision on this issue is also based on its finding that the reserve account was not a true liability under ARM § 42.22.113 (1982). The rule defines the components of the stock and debt indicator, and the relevant part reads:

> A market value or stock and debt indicator of value shall be derived from the company's outstanding liabilities. The department shall consider the market value of the company's preferred and common stocks, outstanding debt, and the net of current assets and current liabilities. The sum of these items represent an indicator of market value for all the company's property. When the sum represents both operating and nonoperating property, the department will deduct the market value of the nonoperating property.

ARM § 42.22.113 (1982). The District Court concluded that the reserve account could not be included in this regulation because it was neither an instrument traded on the financial

11

market nor a true liability as required by the regulation. We disagree.

Substantial credible evidence supports the Board's decision approving treatment of the account as a liability. First, as stated in regard to issue I, the District Court should not interpret the Department's regulations so narrowly that the statute's mandate for finding market value is frustrated. Second, the use of the word "outstanding debt" in the regulation is sufficiently comprehensive to include an account which must serve to offset the loss of depreciation deductions Puget may experience in the future. Puget argues that use of the reserve to offset future liability is a contingency which may never occur because tax laws may change or reinvestment will allow Puget to maintain accelerated deductions. However, lack of such an account has lead to problems in the past when accelerated deductions turned out to be unavailable. See Memphis Light, Gas, & Water Division v. Federal Power Commission (D.C. Cir. 1974), 500 F.2d 798 (company allowed to switch from flow through accounting to normalization accounting in rate making because evidence showed tax savings on expansion property would not be available to offset declining depreciation on older properties). Thus, we hold that the Board ruling that the Department may treat the account as a liability is not clearly erroneous, and reverse the District Court on this issue.

## Issue III.

The District Court found that the Department arbitrarily and capriciously valued townsite property. The value used by the Department and approved by the Board was the value of the property as assessed by the Department's local Rosebud County appraiser for taxes.

12

Puget's position, which the District Court adopted, is that the local assessment undervalued the townsite property because the property originally cost Puget $6,385,395, and the county appraised the property at $1,629,146. Puget pointed out that the cost of the property is included in the cost indicator, and argued that it should be taken out at the same value less average depreciation at which it was put in. On appeal, the Department argues that the townsite non-operating property must be valued according to statutes governing local assessment of property, and that Puget's contentions on the value included in the cost indicator ignore the fact that the cost indicator, as a weighted component, constitutes only a portion of the data used to determine the unit value of Puget.

The following finding by the Board was reversed by the District Court:

> The Board finds that the townsite is a nonoperating property and as such, its value must not be apportioned to the counties nor should it be considered as a portion of the Montana value. Evidence revealed that the townsite property is real estate. Real estate cannot be valued pursuant to a mechanical apportionment formula. Instead, it must be appraised according to accepted real estate valuation principles. Puget introduced no evidence, based upon proper valuation principles, which overcame the Department's valuation of 1,629,146 for the townsite.

In reviewing the contentions on this issue, we are in agreement that it would seem unfair to value townsite property at a higher value for inclusion in the cost indicator, and then take it out of the total unit value at a lower value. However, Puget bears the burden of showing that this is what was done. Furthermore, there are various amounts of depreciation, arrived at by different methods,

taken on property included in the cost indicator, and the cost indicator is included in the total valuation at a weight of only 50%. Thus, we hold that the Board did not clearly abuse its discretion by accepting the locally assessed value.

Another aspect of this argument also persuades us to reverse this issue. The Department argues that §§ 15-7-111 to- 114, MCA, provide the exclusive methods for valuing residential property, and that $1,629,146 was the figure arrived at under these procedures. Thus, according to the Department, no further inquiry into the townsite value should be allowed.

Under the facts of this case, we agree with the Department. Puget's local taxes were assessed based on a townsite value of $1,629,146. If the Department were to follow the District Court's mandate on remand Puget would pay local taxes on property valued using the low figure, and would have the high figure deducted from the value of the centrally assessed property for state wide taxation purposes. In other words, Puget would have the best of both worlds because the company would not pay any taxes on the difference between the high and low figures. Under these circumstances, the Board did not abuse its discretion by approving use of the local appraisal.

### Cross-appeal Issue

The District Court affirmed the Board's conclusion that the stock and debt indicator should not be adjusted to reflect the amount of CWIP not expected to go into service. Puget concedes that the Department removed the value of deductible assets from the stock and debt indicator, but contends that the indicator retained value of CWIP not expected to go into service because the Board and the District Court erroneously refused to remove the cost of CWIP

14

not expected to go into service from the liability side of the balance sheet.

The District Court affirmed the Board because evidence disclosed that the reduction in the value of CWIP as a result of CWIP not expected to go into service was already reflected in the market value of Puget's stock and debt. The District Court also found that the Department's regulations require that CWIP be included at its market value rather than at its cost value. See ARM § 42.22.113 (1982). Puget's proposal on this issue, according to the District Court, would deduct the value of CWIP not expected to go into service at its cost rather than its market value.

We affirm the District Court on this issue because substantial evidence reveals that a reduction equaling the cost of the CWIP would overstate the loss of the property's value for Puget. We also agree with the District Court's conclusion that the stock and debt indicator should include property at its market value rather than at its cost value.

In summary, we reverse the District Court's opinion and order on the appellant's issues 1-3 and remand for reinstatement of the Board's order on these issues. The issue on cross-appeal is affirmed.

<br>

Justice _____

We concur:

Chief Justice _____

15

John Conway Harrison

Fred J. Weber

John C. Sheehy

William E. Hunt Sr.

R. C. Gulbrandson

Justices