No. 88-160

IN THE SUPREME COURT OF THE STATE OF MONTANA

1989

_____

PORTLAND GENERAL ELECTRIC COMPANY,

        Plaintiff and Appellant,

    -vs-

MONTANA DEPARTMENT OF REVENUE,
et al.,

        Defendants and Respondents.

_____

APPEAL FROM:  District Court of the First Judicial District
               In and for the County of Lewis & Clark,
               The Honorable Henry Loble, Judge presiding.


COUNSEL OF RECORD:

    For Appellant:

        Donald R. Murray; Murphy, Robinson, Heckathorn &
        Phillips, Kalispell, Montana
        Thomas H. Nelson argued; Stoel Rives, Boley, Jones &
        Grey, Portland, Oregon

    For Respondent:

        Larry G. Schuster argued, Department of Revenue,
        Helena, Montana


                    Submitted: February 28, 1989

                      Decided: May 10, 1989

Filed:

_____
          Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

Appellant, Portland General Electric (hereinafter PGE), appeals an order entered by the Honorable Henry Loble, First Judicial District Court, Lewis and Clark County, Montana, denying injunctive and declaratory relief. We affirm.

This case concerns the imposition of beneficial use taxes, pursuant to § 15-24-1203, MCA (1983), for appellant's use of the Hot Springs to Idaho Border portion of the BPA 500 kilovolts (KV) transmission line system within the State of Montana.

> [T]here is imposed and shall be collected a tax upon the possession or other beneficial use enjoyed by any private individual, association, or corporation of any property, real or personal, which for any reason is exempt from taxation . . . The tax shall be imposed upon the possession or other beneficial use of an electric transmission line and associated facilities, except that lines and facilities of a design capacity of less than 500 kilovolts shall not be subject to the tax.

Section 15-24-1203, MCA.

Much of the factual background surrounding this case has previously been discussed in our decision, Pacific Power & Light Co. v. Department of Revenue, No. 88-151, decided April 17, 1989. Therefore, we will limit the extensive background discussion and instead focus on the additional facts relevant to this case.

PGE is an investor-owned utility which provides retail electric utility service to customers located in the State of Oregon. PGE owns an undivided 20% interest in Colstrip Units III and IV, which began operation in October of 1983 and 1985, respectively. The other four Colstrip owners are

2

Pacific Power & Light Company, Washington Water Power Company, Puget Sound Power & Light Company, and Montana Power Company. Collectively, these companies are referred to as the "Colstrip Owners."

With the development of Colstrip Units III and IV, additional transmission capacity was needed from the Colstrip facilities to the west. To accommodate the increased generation, Colstrip Owners initially converted one 230 KV line extending from the generating facilities to a substation near Broadview, Montana, to 500 KV and constructed a second 500 KV line. From the Broadview substation, the Colstrip Owners' 500 KV lines extend westward to a point near Townsend, Montana. At Townsend, the Colstrip Owners' 500 KV lines interconnect with the Bonneville Power Administration's (BPA) 500 KV lines. The portion extending from Townsend to the BPA's Garrison substation is referred to as the Montana Intertie, and is extensively discussed in our previous opinion, Pacific Power & Light Co. In 1986, anticipating the completion of Colstrip Unit IV, the BPA, at the request of the Colstrip Owners, completed the Garrison-West lines connecting the Garrison substation to the Taft, Montana, substation and points to the west. Prior to the completion of the Garrison-Taft 500 KV transmission lines, the Hot Springs-Dworshak lines were the only existing 500 KV lines providing access to the west.

From the BPA substation at Garrison, Montana, the transmission of Colstrip power is governed by separate contracts, commonly referred to as the Garrison-West Agreement. These contracts continue for a period of 22 years, with a right to renew at comparable terms. Under each Owners' separate contract with the BPA, power would be introduced at the Garrison substation and transmitted across the entire BPA "main grid" which included both 230 and 500 KV

3

lines. Notably, appellant entered into no other agreement for the transmission of its Colstrip power to points west.

Under the terms of PGE's agreement with the BPA, PGE requested BPA provide adequate transmission facilities west of Garrison, Montana, to transmit power on a firm basis over the Federal Transmission System to PGE's system load at the Pearl substation in Oregon. PGE made available and BPA was required to accept scheduled power not to exceed the reserved transmission demand set forth on Exhibit D of the Garrison-West Agreement. Exhibit D provided that from the date of commercial operation of Colstrip Unit III until the date when the 500 KV transmission lines connecting Garrison to the Federal 500 KV transmission system first became available for scheduling power (the Garrison-Taft lines), the transmission demand for PGE was zero. However, a footnote to Exhibit D provided for the five Colstrip owners to allocate BPA's available 330 megawatts transmission capacity.

At this point, a brief explanation describing the 330 megawatt limitation is in order. From the Garrison substation to points west, the BPA lacked transmission line capacity to accommodate full transmission of Colstrip power to the Owners' individual system loads. This lack of transmission capacity is due to a gap in the 500 KV lines between the Garrison substation and the Hot Springs substation, referred to in this litigation as the "bottleneck." Between the two substations, the BPA had only 230 KV lines, which proved insufficient to accommodate the total scheduled Colstrip power. Recognizing its inability to fulfill obligations under the Garrison-West Agreements, the BPA imposed a 330 megawatt limitation upon the amount of power which could be scheduled west of the Garrison substation, until the Garrison-Taft 500 KV lines were completed.

4

On December 20, 1983, a Montana Power Company representative contacted BPA officials indicating Colstrip Owners had reached an agreement on the allocation of BPA's 330 megawatts. Respectively, PGE was allocated 65 megawatts transmission demand. The reserved amount is reflected in a revised Exhibit D to the PGE's Garrison-West Agreement. In turn, the BPA responded on February 4, 1984, stating:

> This is to confirm that each of your companies [Colstrip Owners] has sent BPA a letter agreeing with the allocation, contained in The Montana Power Company's letter dated December 20, 1983, of the 330 MW of transmission capacity available to the Colstrip owners on BPA's Garrison-Hot Springs transmission line during the period starting with commercial operation of Colstrip Unit No. 3 and ending at 2400 hours on the date when the Garrison-Taft 500 kV transmission line is available for scheduling power, pursuant to existing contracts for wheeling Colstrip power.
>
> . . .

| Company | Bonneville Contract No. | Transmission Demand |
|---------|------------------------|---------------------|
| . . . | | |
| Portland | DE-MS79-81BP00167 | 65 MW |

Once scheduling of Colstrip power over the Hot Springs to border line began, PGE was required to pay BPA a monthly charge calculated pursuant to the terms of the Garrison-West Agreement. The transfer of energy was "deemed" to have occurred whether or not there was actual physical transmission. Therefore, the monthly charge was due BPA regardless of PGE's actual transmission flow across the lines.

Beginning in the tax year 1985, the Department of Revenue (DOR) imposed taxes upon appellant for its

5

"beneficial use" of the BPA 500 KV transmission lines from Hot Springs to the Idaho border. The assessment was based upon a report submitted by PGE, pursuant to Rule 42.22.107, ARM, stating that it "had no possession or use of a government-owned transmission line in 1984; it had only a contract right to certain services provided by the Bonneville Power Administration ("Bonneville") on the 500-kilovolt transmission line" between Townsend-to-Garrison and Hot Springs-to-Idaho border. The other Colstrip Owners did not submit similar reports to the DOR. The DOR prepared a beneficial use assessment for PGE using the unitary approach. Initially, the DOR assessed PGE's use of the Hot Springs to border lines based upon the capitalized payments made by PGE to the BPA in 1984. However, shortly before trial, depositions revealed such payments represented charges for the use of both 230 and 500 KV lines. Thereafter, the DOR prepared a revised assessment excluding the effect of tax-exempt 230 KV lines.

Appellant presents eight issues on appeal, each of which would invalidate the imposition of the challenged taxes. Three of the issues arise under the United States Constitution, three under the Montana Constitution and two are statutory challenges. However, our decision in Pacific Power & Light, Co. forecloses appellant's arguments of the first seven issues. Therefore, our opinion will deal exclusively with appellant's eighth issue contending that a portion of the beneficial use tax assessment was attributable to exempt property.

This case comes to us against a backdrop of extensive technological changes in the electrical transmission industry. Goldberg v. Sweet (1989), ____ U.S. ____, 109 S.Ct. 582, 102 L.Ed.2d. 607. As noted in the factual discussion, BPA's entire integrated network is used to

6

schedule power. The power transmitted across electrical lines can not be accurately identified, and indeed, the path taken is often indirect and bears no relation to contract requisites. Instead, we have only the input point and the eventual withdrawal of energy at a specified location. Between the two, various factors indicate a likely, though not actual, transmission path.

Initially, we discuss our determination that PGE possessed a "beneficial use" within the meaning of the statute. Contrary to appellant's argument, no physical possession, exclusive use or control of the facilities is necessary. Rather, "beneficial use" has long been defined as a right recognized by law and enforceable by the courts.

> The expression "beneficial use" or "beneficial ownership or interest" in property is quite frequent in the law, and means, in this connection, such a right to its enjoyment as exists where the legal title is in one person and the right to such beneficial use or interest is another, and where such right is recognized by law, and can be enforced by the courts, at the suit of such owner or of some one in his behalf.

Montana Catholic Missions v. Missoula County (1906), 200 U.S. 118, 127-128, 26 S.Ct. 197, 200, 50 L.Ed. 398, 402; See also Harrison v. City of Missoula (1965), 146 Mont. 420, 407 P.2d 703; Pacific Power & Light, Co. To advance its commercial activities, and thereby increase profits, PGE contracted for firm transmission capacity over the BPA lines. This is an enforceable contract interest in firm megawatts of power. While PGE may not possess the lines, nonetheless, the power flowing through the lines remain under PGE's ownership. Finally, PGE pays for the use of the lines regardless of the actual transmission flow. We find the reservation of firm

7

transmission demand grants PGE an exclusive right taxable under § 15-24-1203, MCA.

The physical wheeling of energy is not specific as to which line it passes through, but rather the energy can travel through various lines as long as the delivery point is where the contract specifies. However, the facts reflect the essential nature of the Hot Springs-Dworshak lines. PGE contracts to transmit bulk transfers of power, necessitating the use of the higher voltage, lower impedance, 500 KV lines. Without the Hot Springs lines, the transfer capability of Colstrip power to the west would be substantially affected. Indeed, BPA officials indicated that it could not fulfill contract obligations absent the Hot Springs lines. Clearly, the Hot Springs lines are a vital portion of the BPA's main grid.

Appellant contends the DOR's assessment erroneously assumed that only 500 KV facilities would be used in providing services, ignoring the fact that a substantial portion of the transmission facilities consist of tax exempt 230 KV lines. PGE argues that in reality, the power is scheduled over the entire BPA transmission system and generally no line or path is associated with a particular power schedule.

The 500 KV lines from Hot Springs to the Idaho border are in the direct transmission path of PGE's bulk energy transfers to its Pearl substation. It is significant to note that no 230 KV lines exist parallel to the 500 KV lines. This fact strengthens the assumption that the 500 KV lines are essential to PGE's energy transfers in this case, and are properly taxed.

It is not disputed that the DOR did not rely on actual transmission flows. Rather, the assessment was based exclusively upon PGE's Garrison-West Agreement with the BPA

8

providing for firm transmission rights. To eliminate any influence of 230 KV lines in the assessment, the DOR requested BPA to provide detailed information regarding the actual cost of the installed Hot Springs lines located within the State of Montana, and information regarding the total capacity of the lines and date of installation. From the total cost, the DOR applied a straight line depreciation to the amount, awarding 13 years depreciation based upon a 35 year life. To the depreciated cost, the DOR multiplied a fraction isolating PGE's interest in the lines, (denominator represents the lines' capacity; and the numerator consists of PGE's firm transmission demand). This value was then integrated into PGE's centralized assessment, and thereby subject to a 40% weighting figure which the DOR ascribes to the cost indicator. Puget Sound Power and Light Co. v. Department of Revenue (Mont. 1988), 761 P.2d 336, 45 St.Rep. 1078.

A tax for the beneficial use of property, as distinguished from a tax on property itself, is commonplace. Likewise, the United States Supreme Court decisions support a tax measured by the value of the tax-exempt property:

> In measuring such a use tax it seems neither irregular nor extravagant to resort to the value of the property used; indeed no more so than measuring a sales tax by the value of the property sold. . . In our judgment it was not an impermissible subterfuge but a permissible exercise of its taxing power for [the State] to compute its tax by the value of the property used.

United States v. City of Detroit (1958), 355 U.S. 466, 470, 78 S.Ct. 474, 476, 2 L.Ed.2d 424, 427; United States v. Boyd (1964), 378 U.S. 39, 84 S.Ct. 1518, 12 L.Ed.2d 713.

9

Reviewing the facts, we conclude that the tax was imposed on the privilege of using the property. The assessment reflects PGE's contractual reserve arrangement with the BPA, thereby ignoring actual flows and the lines' west to east transmission capacity.

Affirmed.

_John Conway Harrison_
Justice

We concur:

_J. A. Turnage_
Chief Justice

_L. C. Gulbrandson_

_R. C. McDonough_

_William E. Hunt Sr._

_John C. Sheehy_

_R. J. Weber_
Justices

10